**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

GINA M.,

     Plaintiff,

v.                                             CIVIL ACTION NO. 3:25-cv-00266

FRANK BISIGNANO,[1]
Commissioner of Social Security,

     Defendant.

**PROPOSED FINDINGS & RECOMMENDATION**

Plaintiff Gina M. ("Claimant") seeks review of the final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying her application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–433. (ECF No. 2). This matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and is referred by standing order to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3). Presently pending before this Court are Claimant's *Brief in Support of Complaint* (ECF No. 9) and the Commissioner's *Brief in Support of Defendant's Decision* (ECF No. 11). Having fully considered the record and the

---

[1] Frank Bisignano became the Commissioner of Social Security on May 7, 2025, at which time he was automatically substituted as a party. Fed. R. Civ. P. 25(d).

parties' arguments, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 9), **GRANT** the Commissioner's request to affirm his decision (ECF No. 11), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A.    Information about Claimant and Procedural History of Claim

Claimant was sixty-one years old on June 15, 2017, her alleged disability onset date, and sixty-eight years old February 13, 2024, the date of the decision by the Administrative Law Judge ("ALJ"). (Tr. 61, 761).[2] She has a high school education, and past relevant work experience as a fundraiser and gift wrapper/office clerk. (Tr. 818). Claimant alleges that she became disabled on June 15, 2017, due to "back problems, asthma, [chronic obstructive pulmonary disease] COPD, diabetes, and high cholesterol." (Tr. 817).

Claimant filed her application for Title II benefits (the "claim") on December 4, 2017. (Tr. 10). The Social Security Administration (the "Agency") denied the claim initially on May 10, 2018, and again upon reconsideration on July 5, 2018. (Tr. 10, 51, 71). Thereafter, Claimant filed a written request for hearing which was received by the Agency on August 23, 2018. (Tr. 10). An administrative hearing was held before an ALJ on August 5, 2019. (Tr. 26-50). Subsequently on October 16, 2019, the ALJ entered an unfavorable decision. (Tr. 10-16). Claimant then sought review of the ALJ's decision by the Appeals Council on October 16, 2019. (Tr. 1). Ultimately the Appeals Council denied Claimant's request for review on June 18, 2020, and the ALJ's decision became the final decision of

---

[2] All references to "Tr." herein refer to the administrative *Transcript of Proceedings* filed in this action at ECF No. 6.

the Commissioner on that date. *Id.* Claimant appealed, and after a remand from this Court in September 2021 (Tr. 840-41), the Appeals Council issued a corresponding order remanding the case. (Tr. 845-50). A new hearing was held before an ALJ on January 22, 2024. (Tr. 767-93). Claimant, who was represented by an attorney, appeared and testified along with a vocational expert. *See id.* On February 13, 2024, the ALJ issued her decision finding Claimant not disabled. (Tr. 745-766). The Appeals Council then denied Plaintiff's exceptions to the ALJ's decision on February 28, 2025 (Tr. 739-744), and the ALJ's decision became the final decision of the Commissioner on that date.

Claimant brought the present action on April 22, 2025, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed a transcript of the administrative proceedings on June 18, 2025. (ECF No. 6). Claimant subsequently filed her *Brief in Support of Complaint* on August 18, 2025. (ECF No. 9). In response, the Commissioner filed his *Brief in Support of Defendant's Decision* on September 15, 2025. (ECF No. 11). Accordingly, this matter is now ripe for adjudication.

### B.    Relevant Evidence

The undersigned has considered all evidence of record pertaining to the parties' arguments, including the medical evidence, and summarizes the most relevant portions[3] herein for the convenience of the United States District Judge.

### i.    Treatment Records

On February 1, 2017, Claimant presented to her chiropractor, Robert S. Nease, D.C. (Tr. 362). Claimant's chief complaints were "lumbar, right sacroiliac, left sacroiliac, left

---

[3] A portion of Claimant's medical records predate the alleged onset date of June 15, 2017. (*See, e.g.*, Tr. 544-96) (hospital records from St. Mary's Medical Center covering period from March 15, 2016 to July 21, 2016). Likewise, a portion of the medical records post-date the "date last insured" of September 30, 2018. (*See* Tr. 597-601) (office treatment records from Marshall Internal Medicine dated June 14, 2019).

buttock and right buttock discomfort" with a pain rating at six on a scale of one to ten. *Id.* On examination, Chiropractor Nease noted "hypertonicity in the lumbar, right sacroiliac and left sacroiliac" as well as lumbosacral and sacroiliac subluxation. *Id.* He performed spinal manipulation "to improve the function of the following fixated segments: L3, L5, right [sacroiliac] SI joint and left SI joint." *Id.* Additionally, he applied electrical muscle stimulation in the form of interferential current on the lumbar area. *Id.* The treatment plan involved "detailed instructions on starting a home exercise program along with cryotherapy at home." *Id.* He recommended weekly follow-up. *Id.* Claimant continued to treat with Chiropractor Nease, who added decompression therapy to his treatment plan. (*See*, e.g., Tr. 387-88). Claimant saw Chiropractor Nease throughout 2017, until April 11, 2018. (Tr. 454). Treatment notes from April 11, 2018 indicate that Claimant's future prognosis "is undetermined at this time." *Id.* Nonetheless, at that time he recommended that Claimant "return in one week" for continued ultrasound therapy as well as decompression to help "alleviate the axial load to the structures of the spine that are eliciting the patient's pain[.]" *Id.*

On June 23, 2017, Claimant presented to her primary-care physician, Matthew Harris, M.D., at Cabell Huntington Hospital Family Practice in Barboursville, West Virginia. (Tr. 311). Claimant complained of shortness of breath and fatigue. *Id.* She reported that her symptoms "[s]tarted yesterday [while] painting the house" but that she had been "feeling bad for a while." *Id.* She denied diarrhea, nausea, or vomiting, but reported feeling weak, constant wheezing, sweatiness, and palpitations. (Tr. 312). She denied having chest pain, dizziness, or numbness. *Id.* On examination, Dr. Harris noted normal cardiovascular function, normal respiratory effort and normal breath sounds. *Id.* However, he did note that Claimant's subcutaneous tissues were "cool moist- [and]

4

clammy." (Tr. 313). Dr. Harris found that Claimant's "finger stick" test resulted in a blood-glucose level of 406. *Id.* Dr. Harris assessed asthma as well as "Diabetes mellitus type 2, uncontrolled." *Id.* He prescribed an albuterol inhaler as needed and provided education on diabetes management, including "why this elevated [blood gluscose] . . . can make her feel so weak." *Id.* Additionally, Dr. Harris ordered laboratory testing. *Id.* He advised Claimant to follow up in one month. (Tr. 314).

On July 26, 2017, Claimant presented to St. Mary's Medical Center in Huntington, West Virginia, for medical imaging of the lumbar spine. (Tr. 248). The report indicated no evidence of acute fracture or subluxation, and the "[c]onus terminate[d] in [a] normal position." *Id.* The report did indicate lumbar levoscoliosis as well as degenerative endplate signal abnormality appearing at the L1-L2 and L3-L4 vertebrae. *Id.* There were also mild-to-moderate degenerative changes elsewhere in the spine. *Id.* The impression was lumbar degenerative-disc disease and facet osteoarthritis superimposed on scoliosis; moderate narrowing of the central canal at the L3-L4 and L4-L5 vertebrae; and relatively mild degrees of foraminal stenosis which appeared greatest "on the right at L3-L4." *Id.* Additionally, gallstones were noted. *See id.*

Claimant underwent a laparoscopic cholecystectomy—or gallbladder removal—on September 1, 2017 due to symptomatic gallstones. (Tr. 263). Claimant tolerated the procedure well. (Tr. 269).

On September 18, 2017, Claimant presented to her primary-care physician, Matthew Harris, M.D., at St. Mary's Medical Center in Huntington, West Virginia. (Tr. 258). Treatment notes indicate Claimant was following up after her gallbladder-removal surgery on September 1, 2017. *Id.* Claimant reported constant, increased pain on her left side, which she rated at a ten on a scale from one to ten. *Id.*

5

Claimant followed up with Dr. Harris on December 4, 2017. (Tr. 300). Claimant reported cough, fatigue, hypertension, diabetes, and anxiety. *Id.* She reported coughing, wheezing, and shortness of breath associated with her asthma diagnosis. (Tr. 302). She denied any decrease in cognitive skills, and "denie[d] depression, difficulty concentrating or difficulty in making decisions." *Id.* Further, Claimant "[d]enie[d] a psychiatric disorder" and "denie[d] anxiety." *Id.* On examination, Dr. Harris noted abnormal respiratory effort, abnormal breath sounds, and wheezing. *Id.* Further, Dr. Harris found that Claimant's gait and station were normal, and that Claimant had "normal coordination of body movements" and no signs of arthritis. *Id.* Dr. Harris found that Claimant had normal judgment and insight, intact memory, and normal mood and affect. *Id.* Dr. Harris assessed bronchitis, obstructive sleep apnea, dyspnea, fatigue, hypertension, dyslipidemia, "Diabetes mellitus type II, controlled," and wheezing. (Tr. 303). He prescribed antibiotics and steroid medication, as well as laboratory testing and a sleep study. *Id.*

### ii.    Claimant's Hearing Testimony

At the January 22, 2024 hearing before the ALJ, Claimant was represented by counsel and testified under oath. (Tr. 679-70). Claimant testified that she is right-handed. (Tr. 770). She does not drive. (Tr. 771). She fears she would not be able to stop the car due to back pan and sciatica. *Id.* She has not worked since June 16, 2016, her original onset date. *Id.* Her prior work at Macy's involved gift wrapping and shipping orders as well as handling cash registers and boxes of coins. (Tr. 771-72). As part of her work for Macy's, she would lift up to twenty pounds. *Id.* In 2007 and 2008, she was self-employed "for a end-design fundraising" role that required her to travel. (Tr. 772). Her job responsibilities

required her to load and unload merchandise and set up displays. *Id.* In that role, she would lift up to fifty pounds. *Id.*

Claimant testified that she stopped working to care for her mother-in-law and because the job role "was too much on [her]" due to the heavy lifting required. (Tr. 773). At that time, she had a lot of back pain that was exacerbated by the lifting, walking, standing, and pushing involved in her job role. *Id.* She experienced some pain in her feet and legs, but the majority of the pain was centered in her lower back and hips. (Tr. 774). She also had trouble with swelling in her legs and feet "for a long time" including "[w]hen [she] worked at the hospital[.]" *Id.* She treated the pain with over-the-counter medications like Tylenol. *Id.* During the relevant time period, her back pain caused her to stumble and fall often. (Tr. 782).

At the time she quit working, Claimant took medication for COPD, high blood pressure, high cholesterol, diabetes, depression, and anxiety. *Id.* Her blood pressure and blood sugar was not well-controlled with the medication, though medication did help "a little" with her depression and anxiety. (Tr. 775). She was hospitalized due to side effects from one of her unspecified medications; she was also hospitalized for diverticulitis in 2016. (Tr. 775, 784-85). Claimant's diverticulitis caused her to "go to the bathroom constantly," approximately "two to three times a day[.]" (Tr. 778, 785). It would cause her to be late for work at times and would interfere with her ability to work. (Tr. 778-79). She would be off task in the bathroom for "[a]bout fifteen, twenty minutes" due to her symptoms. (Tr. 785). The symptoms were unpredictable and urgent. *Id.* Claimant further testified that her uncontrolled diabetes resulted in her admittance to the hospital in 2016 and 2017. (Tr. 786). Her blood-glucose reading "was over 400" and she experienced sweating, nausea, and dizziness. *Id.*

Claimant's past surgeries include a gallbladder removal; additionally, she has received an injection in her back for pain. (Tr. 775). She did not undergo physical therapy, but she did see a chiropractor. *Id.* The chiropractor told her "the only thing [she] could do is surgery" for the pain. (Tr. 776). She was diagnosed with muscle spasms in her low back and advised to avoid long periods of standing and sitting. (Tr. 783). Due to back pain, she needed to lie down several times a day. *Id.* It affected her ability to think. (Tr. 786-87).

Claimant testified that she was never hospitalized for depression or anxiety during the relevant time period. (Tr. 776). Claimant testified that "[t]hey tried to get [her] to" receive counseling, but that she "wouldn't' do it." *Id.* Claimant further testified that she had COPD, and that hot weather made her breathing worse. (Tr. 777). She used inhalers "once or twice a day." (Tr. 778). She recalls being hospitalized for breathing problems. *Id.*

At the time she quit working, Claimant could walk "maybe a fourth of a block, half a block" before needing to stop. (Tr. 777). She could stand "probably ten minutes, fifteen." *Id.* She estimated she was able to sit "[m]aybe thirty minutes or so" before needing to get up. *Id.* Further, she was able to lift "maybe seven, eight pounds" at the most. *Id.* She testified that there were days in which she had to get up from a sitting position and stand up due to back pain. (Tr. 783). Claimant further testified that her COPD-related breathing problems "limited [her] in terms of how much [she] can walk" before needing to sit down. (Tr. 784).

Claimant also testified that she experienced memory problems. (Tr. 777). She was able to concentrate approximately "two, three minutes, probably." (Tr. 778). She did not experience "any trouble getting along with other people." *Id.* She would sleep up to eight hours per night and experienced drowsiness with her medication. (Tr. 779). She was able to manage personal hygiene herself although she reported that her husband "would help

8

[her] every so often" when she had trouble putting pants on due to back pain. *Id*. With respect to housework, she "tried to do some laundry, and run the dishwasher, that was about it." (Tr. 780). She hired someone to help with housecleaning, and her husband cleaned the floors. *Id*. She performed "some" grocery shopping. *Id*. She would go out to eat "every once in a while" but "[t]hat was about it." *Id*. She did not "do much home cooking" beyond making a sandwich or heating up some soup in the microwave. *Id*. She testified that she did not have any hobbies. *Id*.

Finally, Claimant testified that she has "been depressed for a long time." (Tr. 781). As a result, she does not "want to do anything" and does not "talk much to people anymore." *Id*. She experienced trouble paying attention. *Id*. She rarely leaves the house except for doctor appointments. *Id*. It has worsened over time; during the relevant time period, she left the house "maybe three, maybe four times a week[.]" (Tr. 782).

### iii.    Vocational Expert Testimony

At the January 22, 2024 administrative hearing, the ALJ employed a vocational expert (the "VE") to aid her in determining whether Claimant could perform her past relevant work, or other work. (Tr. 789). The ALJ asked the VE to classify Claimant's past relevant work, and the VE testified that Claimant's work at Macy's was "a composite" position. (Tr. 790). "The first aspect of the position . . . was an order taker" which is a "semi-skilled" position with a specific vocational preparation ("SVP") of four. *Id*. Further, the position is classified at a sedentary level of exertion as generally performed, but a light level of exertion as actually performed. *Id*. The VE testified that "[t]he other aspect of the position . . . was a cashier checker" which is also a "semi-skilled" position, but with an SVP of three. *Id*. The "cashier checker" position is classified at the light level of exertion. *Id*.

9

Lastly, the VE testified that Claimant's "last position is a merchandise displayer," which is a "skilled" position with an SVP of six and a medium level of exertion. (Tr. 790-91).

The ALJ next asked the VE to assume that a hypothetical individual had the same age, education, and work history as the Claimant who was capable of performing work at the medium exertional level, with some additional limitations. (Tr. 791). Specifically, the hypothetical individual could "frequently climb, stoop, kneel, crouch, and crawl." *Id.* The VE testified that such an individual could perform all of Claimant's past work. *Id.* In response to additional questioning from the ALJ, the VE further testified that "all competitive employment" would be precluded if the individual would be absence from work two or more days per month. *Id.*

In response to questioning from Claimant's counsel, the VE testified that "all jobs" would be precluded if the hypothetical individual had "the limitation of occasionally lifting and carrying less than ten pounds, frequently lifting and carrying less than ten pounds, [and] standing and/or walking less than two hours in a[n] eight-hour workday." (Tr. 792). Finally, the VE testified that, similarly, "all jobs" would be precluded if the hypothetical individual had the limitation of "occasionally lift[ing] and carry[ing] twenty pounds, frequently lift[ing] and carry[ing] ten pounds, stand[ing] and/or walk[ing] less than two hours[,] and sit[ting]  less than two hours." *Id.*

#### iv.    Consultative Evaluations/Treating Source Opinions

Claimant's treating provider, Matthew Harris, M.D., completed a "check-box" Residual Physical Functional Capacity Evaluation form dated June 5, 2018. (Tr. 514). Dr. Harris listed a primary diagnosis of "chronic back problems" along with a secondary diagnosis of "copd/asthma," along with high cholesterol. *Id.* Dr. Harris opined that Claimant has the following exertional limits: Claimant can "occasionally lift/carry" less

10

than ten pounds; can "frequently lift/carry" less than ten pounds; can "stand and/or walk" for less than two hours; can sit for eight hours per day; and is "limited" in the ability to "push and/or pull" with the upper and lower extremities. *Id.* Dr. Harris further opined that Claimant has the following postural limitations: Claimant can "occasionally" climb ramps and stairs; can never climb ladders, ropes, or scaffolds; can occasionally balance and stoop; and can never kneel, crouch, or crawl. *Id.* Claimant has the following manipulative limitations: she is limited in the ability to reach in all directions, and in the ability to handle objects. *Id.* Lastly, Dr. Harris opined that Claimant should have the following environmental limitations: she should avoid exposure to extreme cold and heat. *Id.* Based upon the foregoing, Dr. Harris opined that Claimant "has been disabled since June 2017." *Id.*

Claimant's treating chiropractor, Robert Nease, D.C., completed a Treating Source opinion form on January 5, 2018. (Tr. 359-60). He indicated that he began treating Claimant on November 25, 2008, and that Claimant was last seen on November 17, 2017. *Id.* Under the section of the form labeled "Brief History & Diagnoses," Chiropractor Nease noted the following ICD-10[4] codes: (1) M99.03 – segmental and somatic dysfunction of the lumbar region; (2) M54.16 – lumbar radiculopathy; (3) M99.04 – segmental and somatic dysfunction of the sacral region; (4) M99.05 – segmental and somatic dysfunction of the pelvic region; (5) M54.06 – panniculitis affecting the lumbar region of the back; (6) M62.830 – muscle spasm of the back; (7) M54.5 – low back pain; [and] (8) M99.02 – segmental and somatic dysfunction of the thoracic region. *Id.*

---

[4] The undersigned takes judicial notice that "ICD-10," or the International Classification of Diseases, Tenth Revision, is a disease-categorization system developed by the World Health Organization.

Next, Chiropractor Nease opined that Claimant should have an exertional limitation to "[n]o more than 20 lbs lifting" and postural limitations "limit[ing] bending, stooping, and climbing[.]" (Tr. 359). He opined that Claimant had been "compliant with treatment[.]" *Id.* With respect to Claimant's psychological condition, Chiropractor Nease indicated "N/A." *Id.* Further, with respect to Claimant's "low back range of motion," Chiropractor Nease indicated abnormal findings in the form of "[d]ecreased flexion extension, rotation and side bending[.]" (Tr. 361). Chiropractor Nease further opined that Claimant had an "antalgic gait," used a cane, and had "decreased patellar and achilles tendon reflex." *Id.*

Claimant's treating chiropractor, Robert Nease, D.C., completed a "check-box" Residual Physical Functional Capacity Evaluation form dated September 19, 2018. (Tr. 543). Chiropractor Nease opined that Claimant should have the following exertional limitations: Claimant can "occasionally lift/carry" less than twenty pounds; can "frequently lift/carry" less than ten pounds; can "stand and/or walk" less than two hours; can sit less than two hours in an eight-hour day; can "alternate sitting/standing" with one hour sitting and less than thirty minutes standing; and is limited in her ability to "push and/or pull" with her lower extremities. *Id.* Chiropractor Nease did not opine with respect to any postural, manipulative, communicative, or environmental limitations. *See id.* Based upon the foregoing, Chiropractor Nease opined that Claimant "has been disabled since June 2017." *Id.*

### C.    Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an

impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special

technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her

15

"not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant had not engaged in substantial gainful activity "during the period from her alleged onset date of June 16, 2017, through her date last insured of September 30, 2018." (Tr. 750). Next, the ALJ found that—through the date last insured—Claimant had the following medically-determinable impairments: obesity, chronic obstructive pulmonary disease (COPD), asthma, diabetes mellitus, hypertension, diverticulitis, fatty liver disease, cholelithiasis with chronic cholecystitis, gastroesophageal reflux disease, degenerative disc disease with radiculopathy as well as bulging/slipped disks, facet osteoarthritis superimposed on scoliosis, dyslipidemia, chronic fatigue syndrome, shingles, a yeast infection, benign breast disease, bronchitis, gastritis, fundie gland polyps, hemorrhoids, a colon polyp, anxiety and depression. *Id.* However, the ALJ found that Claimant "did not have a severe impairment or combination of impairments . . . that significantly limited the ability to perform basic work-related activities for 12 consecutive months[.]" (Tr. 751). Further, applying the psychiatric review technique, the ALJ found that Claimant's mental limitations were non-severe. *Id.* As a result, the ALJ concluded that Claimant was not under a disability during the relevant time period, and the claim for benefits was denied. (Tr. 760).

## II.   LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434

F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.   DISCUSSION

In this action filed pursuant to 42 U.S.C. § 405(g), Claimant asserts that the ALJ committed two reversible errors. (*See* ECF No. 9). First, Claimant asserts that "[t]he ALJ failed in her duty to fully develop and give full analysis and consideration of all medical and mental evidence regarding [Claimant's] medical and mental impairments[.]" *Id.* at 5. Second, Claimant asserts that "the ALJ failed to consider and properly evaluate [Claimant's] claim under the combination of impairments which together establishes disability." *Id.* In response, the Commissioner argues that Claimant fails to articulate any error in the ALJ's factfinding, and that the decision is supported by substantial evidence. (ECF No. 11). The time for Claimant to file a reply has expired, *see* Rule 8 of the Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g), and this matter

is now ripe for adjudication. For the reasons set forth *infra*, the undersigned **FINDS** that each of Claimant's assertions of error lack merit.

### A.    Development of the Record

According to Claimant, "the ALJ only found [that the Claimant] suffer[s] from obesity, chronic obstructive pulmonary disease (COPD), diabetes, hypertension, diverticulitis, and degenerative changes in the lumbar spine." (ECF No. 9 at 10). The ALJ did not include the impairments of anxiety, depression, and chronic low back pain when she classified Claimant's impairments as non-severe. *Id.* at 5. Further, Claimant argues that she "has also been suffering from chronic low back pain, leg weakness, facet osteoarthritis superimposed on scoliosis, shortness of breath on a constant basis, asthma, dyslipidemia, chronic fatigue, intervertebral disc degeneration of the lumbosacral area causing back pain, lumbosacral radiculopathy, and bulging/slipped discs in the lumbar area, and the mental impairment of depression." According to Claimant, these medical conditions "should also be classified as medical impairments that ha[ve] limited [Claimant's] ability to engage in substantial gainful activity under 20 C.F.R. § 404.1521 for over twelve consecutive months." *Id.* at 6. Claimant argues that "the ALJ failed in her duty to fully develop the medical evidence regarding [Claimant's] multiple medical conditions and erroneously failed to consider certain impairments severe." *Id.* at 10. Further, Claimant argues that, "[b]ecause it is extremely likely that [she] would be absent for at least two days a month due to her multiple conditions and the testimony from the vocational expert that there are no jobs in the national economy that she could perform while missing two days of work a month due to her conditions, [Clamant] is not able to work and hold a steady job." *Id.* at 10. Based upon the foregoing, Claimant seeks remand.

The Fourth Circuit has explained that an ALJ has a "responsibility to help develop the evidence." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). Specifically, the ALJ must "explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant *when that evidence is inadequate.*" *Id.* (emphasis added). Nevertheless, it is the Claimant's responsibility to prove to the Commissioner that she is disabled. 20 C.F.R. §§ 404.1512(a), 416.912(a). *See also Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) ("The claimant must first bear the burden . . . of showing that [she] . . . has a medically severe impairment or combination of impairments[.]"); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981) (explaining that the claimant bears the burden of establishing a *prima facie* entitlement to benefits).

Pursuant to this framework, while the ALJ has a duty to fully and fairly develop the record, he is not required to act as the Claimant's counsel. *See Shawn S. v. Bisignano*, 2:25-cv-00326, 2025 WL 2952798, at *11 (S.D. W. Va. Sept. 22, 2025), *adopted*, 2025 WL 2963880 (S.D. W. Va. Oct. 17, 2025). Where, as in the instant matter, the Claimant was represented by counsel, the ALJ "has the right to assume that [Claimant's] counsel was presenting the strongest case for benefits." *Id.* Thus, "[a]n ALJ's duty to develop the record does not require [her] to make specific inquiries into the [Claimant's] treatment modalities or search for cumulative evidence; [her] duty is to obtain sufficient evidence upon which [s]he can render an informed decision." *Id. See also Perry v. Astrue*, 3:10-cv-01248, 2011 WL 5006505, at *15 (S.D. W. Va. Oct. 20, 2011) (explaining that the ALJ's duty to develop the record "does not permit a claimant, through counsel, to rest on the record . . . and later fault the ALJ for not performing a more exhaustive investigation"). An ALJ's duty to develop the record "is triggered only when there is ambiguous evidence

19

or when the record is inadequate to allow for proper evaluation of the evidence." *Frank L. v. Bisignano*, 3:25-cv-146, 2025 WL 3618868, at *5 (S.D. W. Va. Nov. 25, 2025), *adopted*, 2025 WL 3618309 (S.D. W. Va. Dec. 12, 2025). Consequently, when examining the record to determine if it was adequate to support a reasoned administrative decision, the Court looks for evidentiary gaps that resulted in "unfairness or clear prejudice" to Claimant. *Id.* (citing *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980)).

With respect to Claimant's assertion that the ALJ failed to develop the evidence concerning her numerous impairments, it is noted that Claimant does not specify what evidence was inadequately fleshed out by the ALJ. As the Commissioner highlights in his brief (*see* ECF No. 11 at 6), this Court has repeatedly rejected such undeveloped arguments:

> [Claimant] does not identify any gaps in the record or further evidence that the ALJ should have developed. She cites a legal standard and does not articulate how it applies to her case. [Claimant's] conclusory assertion that the ALJ failed to develop the record does not assert a viable challenge to the Commissioner's decision. Indeed, the Court should not be tasked with researching and constructing [Claimant's] arguments for her. [Claimant] fails to specify any deficiencies in the record . . . [Claimant] does not identify any further inquiries that the ALJ should have made or indicate what further evidence was necessary for the ALJ to render a decision on her disability applications. *[Claimant] lists pieces of medical evidence in her brief, yet she does not explain how any of it prompted further investigation.*

*Shawn S.*, 2025 WL 2952798, at *11 (emphasis added).

Despite Claimant's listing of the various diagnoses and symptoms related thereto in her brief, this is not the litmus test for disability; diagnoses alone do not establish disability, because there must be a showing of *related functional loss*. See *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (*per curiam*) (internal citations omitted).

20

Over the course of nine single-spaced pages, the ALJ identified and evaluated the relevant evidence supporting her finding that Claimant's twenty-three medically-determinable impairments—either alone, or in combination—did not significantly limit Claimant's ability to perform work-related activities for twelve consecutive months. (Tr. 751-60). The ALJ cited specific, relevant evidence that contrasted a lack of *functional limitations* against the mere *diagnoses* to which Claimant points. (*Compare* Tr. 751-60, *with* ECF No. 9 at 5-7).

Claimant relies, *inter alia*, on the opinion of Matthew Harris, M.D., to support her argument. (ECF No. 9 at 7). However, Claimant sidesteps the ALJ's specific consideration of Dr. Harris's opinion. (Tr. 760). The ALJ found that Dr. Harris's opinion was unpersuasive and then explained the evidentiary basis for her conclusion. As the ALJ explained, Dr. Harris's "checkbox" form did not specify the basis for the limitations he suggested; further, his own treatment notes did not support the limitations he recommended. Specifically, the ALJ explained that Dr. Harris's treatment notes indicated Claimant walked with a normal gait, and that she had normal station, normal coordination, and normal breath sounds. (Tr. 760). The ALJ further found that Dr. Harris's opinions were not consistent with the overall record showing conservative treatment for back pain and stable findings concerning Claimant's other impairments. (*See* TR. 760) (citing record evidence).

Claimant further cites to the opinion of her chiropractor, Robert Nease, D.C., to support her argument. (ECF No. 9 at 8-9). However, the ALJ also specifically considered the opinions set forth in Chiropractor Nease's "checkbox" form and explained the evidentiary basis for her conclusion that his opinion was unpersuasive. (Tr. 759-60). For instance, as the ALJ indicated, a review of the chiropractic notes showed that Claimant

reported relief from adjustments, and Chiropractor Nease's notes further showed no corroboration for the findings reported on the form as there were no findings of positive straight leg raising, antalgic gait, weakness, sensation loss, or reflex abnormality. (Tr. 759, 359-94, 451-54). The ALJ's findings are supported by the record. (*See* Tr. 607, 620, 634) (noting Claimant's normal gait, normal muscle tone and strength).

On review, Claimant has failed to demonstrate that the administrative record contains any critical gaps in medical information; to the contrary, the record supplied enough evidence for the ALJ to make a fair and objective assessment of the claim. Simply put, "the ALJ's duty to develop the record does not compel the ALJ to seek additional evidence if the record allows [her] to make a fair decision." *Tara R. v. Comm'r of Soc. Sec.*, 6:24-cv-6516, 2026 WL 585826, at *2 (D.S.C. Mar. 2, 2026). The ALJ considered the medical evidence (and opinions) from the treating and examining sources of record in addition to witness testimony. Importantly, at the hearing, the ALJ asked Claimant's counsel if he had the opportunity to review the record and if he had any objections. (Tr. 769-70). Counsel had no objection, made no request to supplement the record, and did not ask the ALJ for more time to supplement the record. (Tr. 769-70). In short, Claimant has failed to demonstrate any paucity in the evidence that would have warranted further development of the record.

At most, Claimant has demonstrated that she disagrees with the ALJ's weighing of conflicting evidence. However, in reviewing for substantial evidence, it is not the Court's province "to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Craig*, 76 F.3d at 589. Simply put, the ALJ's decision is supported by substantial evidence, and Claimant has failed to demonstrate error.

### B.    Claimant's Combination of Impairments

Lastly, Claimant challenges the ALJ's decision on the grounds that she "failed to consider and properly evaluate [Claimant's] claim under the combination of impairments theory." (ECF No. 9 at 11). Claimant argues that the Residual Functional Capacity Assessments rendered by Claimant's treating providers, Matthew Harris, M.D., and Richard Nease D.C., constitute "uncontradicted competent medical evidence" that both "confirm[] that the combined effect of the plaintiff's severe physical and mental impairments render her unable to function in substantial and gainful activity in any type of job." *Id.*

A claimant should be found disabled at the third step of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes for each of the major body systems impairments which are considered severe enough to prevent a person from doing any gainful activity. *See* 20 C.F.R. § 404.1525. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments is set at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). Because disability is presumed with a listed impairment, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet all of the specified medical criteria." *Id.* at 530. If the claimant is unable to demonstrate that his or her impairments, alone or in combination, match the criteria of a particular listed impairment, the claimant may still establish disability by showing that his or her impairments are medically equivalent to the listed impairment.

23

To establish medical equivalency, a claimant must present evidence that his or her impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a specific listed impairment. *Id.* at 530; *see also* 20 C.F.R. § 404.1526. In 20 C.F.R. § 404.1526, the Agency sets out three ways in which medical equivalency can be determined. First, if the claimant has an impairment that is described in the Listing, but (1) does not exhibit all of the findings specified in the listing, or (2) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria. *Id.* § 404.1526(b)(1). Second, if the claimant's impairment is not described in the Listing, equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a closely analogous listed impairment. *Id.* § 404.1526(b)(2). Finally, if the claimant has a combination of impairments, not one of which meets a listing, equivalency can be proven by comparing the claimant's findings to the most closely analogous listings; if the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar listing. *Id.* § 404.1526(b)(3).

For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is "equivalent" to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. *Sullivan*, 493 U.S. at 531. A claimant cannot qualify for benefits under the "equivalence" step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment. *Id.*

24

The claimant bears the burden of production and proof at this step of the disability determination process. *Grant*, 699 F.2d at 191.

Here, Claimant has not identified which listing she believes her combination of impairments meets or medically equals. Instead, she merely points to the medical-opinion evidence that, as discussed *supra*, the ALJ sufficiently explained was unpersuasive. Claimant's conclusory assertion that her multiple impairments, when combined, are totally disabling, "fails to assert a specific challenge to the Commissioner's decision." *Roger W. v. Colvin*, 3:24-cv-129, 2024 WL 5329920, at *7 (S.D. W. Va. Dec. 30, 2024), *adopted*, 2025 WL 104549 (S.D. W. Va. Jan. 15, 2025) (finding that a claimant "effectively waived this challenge by raising it only in a conclusory fashion"). Here, the ALJ articulated her findings in great detail and explained the evidentiary basis for her determination that Claimant's impairments do not satisfy the listing criteria. (Tr. 751-60). The decision documents the ALJ's well-supported rationale for finding that Claimant's impairments, alone or in combination, did not preclude her from engaging in substantial gainful activity. To the extent that the ALJ did not elaborate further on the analysis of Claimant's impairments in combination, the undersigned finds further elaboration was unnecessary because the required analysis clearly took place. *See Roger W.*, 2024 WL 5329920, at *7. Therefore, the undersigned **FINDS** that the ALJ complied with her duty under the applicable law to consider Claimant's impairments in combination at step three of the sequential evaluation. The ALJ's decision is supported by substantial evidence, and Claimant has failed to demonstrate error.

## IV.    RECOMMENDATION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's

decision (ECF No. 9), **GRANT** the Commissioner's request to affirm his decision (ECF No. 11), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Chambers.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTERED:   March 12, 2026

Dwane L. Tinsley
United States Magistrate Judge

26